FIKE CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 95–58C.

United States Court of Federal Claims.

Sept. 8, 1998.

Warren N. Williams, Kansas City, MO, attorney of record for plaintiff. Hovey, Williams, Timmons & Collins; Logan J. Wilson, of counsel.

John Fargo, Department of Justice, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Vito J. DiPietro, Director, of counsel.

## OPINION

FUTEY, Judge.

This patent case is presently before the court following a trial on the merits. Plain-

tiff seeks compensation from defendant for the unauthorized use of plaintiff's invention, entitled "High Reverse Pressure Resistant Low Forward Burst Pressure Rupture Disc Assembly" (rupture disc assembly).[1] The rupture disc assembly at issue in this case has been used in the propulsion system of the United States Army's Javelin missile. Defendant concedes that plaintiff's patent covers the accused device,[2] but maintains that plaintiff's patent is invalid because: (1) it is both anticipated and obvious in light of prior art; and (2) plaintiff failed to disclose the best mode for constructing its patent.

### Factual Background

In the late 1970's, defendant began to seek a replacement for the Dragon missile, which by that time period, had become ineffective against the then-current tanks of the Soviet Union.[3] In particular, defendant wanted to replace the Dragon with a missile that: (1) had forget and fire capabilities; (2) had a soft launch capability; and (3) would be lethal against enemy tanks.

Specifically, the forget and fire capabilities would allow an infantryman to press the firing mechanism of the launch unit and immediately take cover, thus minimizing the infantryman's exposure to hostile fire. The soft launch capability of the missile would allow the weapon to be fired out of a fox hole, or from a covered fighting position, without injuring the infantryman. In addition, defendant desired a missile that possessed a high lethality, having the ability to climb quickly, and then dive on top of the tank where the armor is generally thinnest.

During the early 1980's, Allegheny Ballistics Laboratory, the Aerospace Division of Hercules, Inc. (Hercules), worked with Texas Instruments on a proof of principle (POP) program where Hercules was responsible for the missile motor and Texas Instruments was responsible for the guidance and warhead portion of the missile.[4] In order to

---

1. Joint Trial Exhibit (Jt.Ex.) 1.

2. Stipulation, Filed Oct. 24, 1997, (Stip.) at ¶ 12.

3. See Trial Transcript (Tr.) at 50.

4. Defendant initially sought to replace the Dragon with a missile first known as the "Rattler." The missile's name was subsequently changed to the "Advanced Antitank Weapon System–Medium," and later again changed to the "Javelin."

sufficiently suppress noise during firing, and at the same time provide adequate flight range for the missile, Hercules determined that the missile motor would need two separate launch and flight stages, with the launch stage having different propellant properties than the flight stage. Hercules proposed to use a rupture disc to separate the two propulsion stages while allowing propulsion gases to be discharged through a single discharge nozzle at the rear of the motor.

Hercules met with plaintiff's sales engineer regarding its need for a rupture disc to separate the flight and motor stages of the missile motor under development by Hercules. Hercules advised plaintiff that the rupture disc was required to withstand a high back pressure on the launch-side of 4500 pounds per square inch (psi), and a significantly lower burst pressure on the flight-side of approximately 1000 psi. The required withstand pressure was later increased to 7000 psi and the burst pressure reduced to 300 psi.

Plaintiff prepared a number of sketches regarding Hercules' requirements. Among them, Sketch (SK) 747–2, sought to utilize an unsupported single-bulge disc,[5] and SK 747–3, which included a single-bulged rupture disc that had a backup for the single dome surface of the disc.[6] SK 747–3 disclosed four openings in the backup member to allow combustion gases to flow through the openings toward the discharge nozzle of the motor upon rupture of the disc. Plaintiff determined that these designs did not satisfy the specifications required by Hercules. In December 1982, however, James Hinrichs, plaintiff's development engineer responsible for new products, formulated a multi-bulged supported rupture disc assembly that, indeed, could withstand the demand requirements specified by Hercules.

On May 14, 1983, Mr. Hinrichs assigned his interest in the rupture disc assembly to plaintiff.[7] Subsequent to this assignment, plaintiff filed an application with the Patent and Trademark Office (PTO) for a patent on the subject rupture disc assembly. On March 19, 1985, the PTO allowed all the claims as filed, and issued U.S. Patent No. 4,505,180 (the '180 patent) to plaintiff. A copy of the '180 patent is located in Appendix A to the court's opinion.

The patent describes the invention as "broadly concerned with a rupture disc assembly having the characteristics of resistence to high burst pressure in one direction, while permitting rupturing under the influence of relatively low burst pressure in the opposite direction."[8] Further, the patent states that "[t]he assembly [finds] particular utility in projectiles fired from hand held weapons in order to permit staged ignition of the propellant in the projectile, so that [the] weapon can be used without fear of injuring the user."[9] The patent cautions, however, that "the disc assembly of the invention can be used in many other contexts where it is desirable to provide resistence to high burst pressure in one direction, while permitting bursting under the influence of relatively low pressures in the opposite direction."[10]

Specifically, the claims of the '180 patent include, in pertinent part:

1. A rupture disc assembly, comprising: a frangible disc presenting a low pressure face, an opposed high pressure face, and scoring on said high pressure face disposed at least partially about a rupture region for the disc; and a backing member adjacent said low pressure face, including:

web means in substantial alignment with said scoring and in close proximity to said low pressure face for preventing rupturing of said disc under the influence of relatively high burst pressures directed against said high pressure face; and structure defining an opening through said backing member for exposing an area on said low pressure face corresponding to said rupture region to burst pressures, and for rupturing of said disc along said scoring under the influence of relatively low burst

---

5. Jt. Ex. 36.

6. Jt. Ex. 37.

7. Plaintiff's Trial Exhibit (Pl.'s Ex.) 1.

8. Jt. Ex. 1, col. 1, lns. 8–13.

9. *Id.,* col. 1, lns. 13–18.

10. *Id.,* col. 4, lns. 53–58.

pressures directed against said low pressure face.

* * * *

4. The assembly of claim 1, there being a plurality of burst regions on said disc, said backing member having an opening therethrough, for each burst region.

5. The assembly of claim 4, each of said burst regions having a concavo-convex face of each portion extending into the corresponding backing member opening.

Figure 4 of the patent shows a sectional view of the rupture disc assembly:

The preferred embodiment of plaintiff's patent discloses a rupture disc assembly 22 comprising a frangible disc 26 having a low pressure face, an opposed and scored high pressure face 32, and a backing member 28 adjacent to the low pressure face. This rupture disc assembly 22 is positioned within a projectile between an initial propellant charge and a secondary propellant charge. During firing of the initial propellant charge, a relatively high burst pressure is developed in the initial charge zone, which exerts pressure against the high pressure side of the disc 32, but yet does not burst the disc 26.

The disc contains a plurality of burst regions defined by the score lines 36,38. The burst regions of the rupture disc include concavo-convex portions 40,42,44,46 with the convex faces forming a part of the low pressure face and extending into corresponding openings 54,56,58,60 through the adjacent backing member 28. Importantly, the rupture disc 26 remains intact because the backing member 28 of the assembly 22 includes web means 50,52 aligned with the disc scoring 36,38 and engage the low pressure face of

the disc 26, thus preventing rupturing of the disc when pressure is exerted against the high pressure face of the disc 32.

Within less than a second of the initial charge, the secondary charge is ignited and exerts a relatively low pressure against the low pressure face of the disc. The pressure created by the secondary charge ruptures the disc 26 along the score lines 36,38 as the score lines are not hindered by the presence of any reinforcing structure adjacent to the high pressure face of the disc 32. The rupturing of the disc along the score lines 36,38 then allows products of combustion to pass through the openings of the backing member 54,56,58,60 and through the chamber containing the initial propellant charge.

At approximately the same time period that the PTO issued the patent to plaintiff, defendant decided to discontinue its search for a replacement for the Dragon missile and, thus, terminated the Hercules and Texas Instruments POP program. The effort to replace that missile resumed, however, in the

mid 1980's and POP contracts were awarded to Texas Instruments, Hughes Aircraft, and Ford Aerospace. Pursuant to the POP contracts, each contractor was to pursue different weapons concepts. In 1989, defendant ultimately chose a joint venture between Texas Instruments and Martin Marietta to go forward in building a replacement for the Dragon missile.[11] Moreover, the joint venture chose Atlantic Research Corporation (ARC) to develop and manufacture the propulsion system of the missile.

ARC conducted a number of preliminary design studies for the project and determined that a rupture disc assembly similar to plaintiff's design used by Hercules in its POP program would be the most beneficial to the project. During the latter part of 1989, ARC mailed requests for quotations for rupture disc assemblies to plaintiff, Continental Disc Corporation (Continental), and BS & B Safety Systems (BS & B). Initially, only plaintiff and BS & B responded. Plaintiff's proposal was based on the '180 patent and was found to be the only technically acceptable source. BS & B submitted a proposal based on a design including a scored single-domed disc with a back-up structure. ARC determined that this design, however, did not meet its technical requirements and rejected the proposal. Initially, Continental did not submit a proposal because it was concerned about infringing plaintiff's '180 patent.[12]

Nevertheless, on January 29, 1990, Continental submitted a bid to ARC, allegedly basing its bid on plaintiff's patented design. ARC accepted Continental's bid and has, to date, acquired substantially all of its requirements for rupture disc assemblies from Continental.

On January 25, 1995, plaintiff filed suit in this court pursuant to 28 U.S.C. § 1498(a)

(1994), alleging infringement of its '180 patent.[13] Specifically, plaintiff alleges that defendant has been infringing and continues to infringe claim 5 of the '180 patent. Defendant concedes that claim 5 of the '180 patent covers the rupture disc assemblies supplied by Continental to ARC. Defendant, however, argues that plaintiff's '180 patent is invalid. Specifically, defendant posits that the '180 patent: (1) is anticipated under the standards of 35 U.S.C. § 102 (1994); (2) is obvious under the standards of 35 U.S.C. § 103 (1994); and (3) fails to disclose the best mode as required by 35 U.S.C. § 112 (1994). The court bifurcated the issue of damages and conducted a trial on the issue of whether plaintiff's patent is invalid. The trial, conducted in Washington, D.C., was held between October 27 through October 30, and November 10 through November 13, 1997. Thereafter, the parties submitted post-trial briefs to this court. Post-trial briefing was completed on March 23, 1998.

### Discussion

#### I. Claim Interpretation

Before the validity of the '180 patent can be determined, the court must define the meaning of its claims.[14] *See Pfund v. United States*, 40 Fed.Cl. 313, 323 (1998). "[T]he court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). If possible, the court should construe the patent to sustain its validity. *North American Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed.Cir.1993); *see also ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577 (Fed.Cir.1984).

---

11. In September 1994, Martin Marietta merged with Lockheed to form Lockheed Martin.

12. *See* Tr. at 317.

13. 28 U.S.C. § 1498(a) (1994) states, in pertinent part:

 Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use

or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

14. The parties stipulate that claim 5 of the '180 patent is dependent upon claim 4, which is dependent upon claim 1. In this regard, the parties also stipulate that claim 5 includes all the limitations of claims 1 and 4. Stip. at ¶¶ 13, 14, 19.

To ascertain the meaning of claims, the court considers three sources: (1) the claims; (2) the specification; and (3) the prosecution history. *Markman*, 52 F.3d at 979. "Claims must be read in view of the specification, of which they are a part." *Id.; see also Slimfold Mfg. Co. v. Kinkead Indus.*, 810 F.2d 1113, 1116 (Fed.Cir.1987) ("Claims are not interpreted in a vacuum, but are part of and are read in light of the specification"). The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996). "For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman*, 52 F.3d at 979.

If the evidence gathered is insufficient to enable the court to determine the meaning of the asserted claims, extrinsic evidence may be relied upon to understand the technology and construe the claims. *Vitronics*, 90 F.3d at 1584. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980; *see also Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1552 (Fed.Cir. 1997). "Extrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims." *Markman*, 52 F.3d at 981 (citing *U.S. Indus. Chems., Inc. v. Carbide & Carbon Chems. Corp.*, 315 U.S. 668, 678, 62 S.Ct. 839, 86 L.Ed. 1105 (1942)).

At the trial conducted in this matter, defendant presented expert testimony from Dr. John E. Cochran, a professor and head of the Aerospace Engineering Department at Auburn University. Dr. Cochran received his Bachelor's degree and his Master's degree in Aerospace Engineering from Auburn University, and his Doctorate in Aerospace Engineering from the University of Texas. He also holds a law degree from the Jones Law Institute.[15]

Dr. Cochran's area of specialty includes dynamics and control, stability and control of aircrafts, and flexible spacecraft attitude dynamics and control. He has authored and co-authored numerous papers and publications, and has done considerable consulting work in dynamics and control. According to Dr. Cochran, the area of dynamics and control relates to "bodies which are not rigid," and that most of his work concerns flexible missiles and spacecrafts.[16]

Plaintiff provided expert testimony from Charles F. Laitner, Senior Vice President of Engineering for plaintiff. Mr. Laitner has a Bachelor's degree in Mechanical Engineering from the University of Missouri and a Master's degree in Business Administration from Bradley University. Since joining plaintiff in 1990, Mr. Laitner has acquired extensive experience in the design, manufacture, and testing of rupture disc assemblies.[17]

The first claim interpretation issue that must be resolved involves the meaning of the term "scoring" as used in claim 1. Specifically, claim 1 provides for "scoring on [the] high pressure face disposed at least partially about a rupture region for the disc."[18] Defendant maintains that scoring is done by creating a reduced line of thickness in order to weaken that line. Defendant asserts that scoring includes, not only a process such as coining, but also other methods which actually remove material from the disc. Plaintiff counters that the term scoring is limited to coining with no subsequent removal of material from the disc.

A claim must be read in view of the specification. *Markman*, 52 F.3d at 979. "The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention." *Id.* Moreover, in interpreting a claim term, that term is generally given its ordinary and customary meaning. *Vitronics*, 90 F.3d at 1582; *see also Wright Medical Technology, Inc. v. Osteonics Corp.*, 122 F.3d

---

15. Dr. Cochran's resume is located at Jt. Ex. 6.

16. Tr. at 156.

17. Mr. Laitner's resume is locate at Pl.'s Ex. 97.

18. Jt. Ex. 1, col. 4, lns. 62–64.

1440, 1443 (Fed.Cir.1997) ("Claim terms are given their ordinary and customary meaning in the field of the invention, unless a special definition is clearly stated in the specification"); *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1563 (Fed. Cir.1990) ("It is a well-established axiom in patent law that a patentee is free to be his or her own lexicographer").

Neither the claims nor the specification of the '180 patent provides a definition for scoring. The prosecution history is equally unhelpful. The Metals Handbook, Eighth Edition, however, defines scoring as "[r]educing the thickness of a material along a line to weaken it purposely along that line." [19] Moreover, Dr. Cochran provided testimony supporting this definition.[20] In this regard, he testified that scoring is similar to grooving. According to Dr. Cochran, grooving involves creating lines of "reduced thickness" by means of coining, etching, or machining.[21]

Mr. Laitner narrowed the definition by stating that "[s]coring is a coining process ... carried out typically with a flat anvil and a die that may have a knife[-]blade type member and is straight shape or in a curved shape." [22] He further expounded: "[Specifically], it is the pressing of metal, and the metal responds to that pressure by flowing away from the pressure just as if it were modeling clay. It leaves the coined impression in the metal." [23] In addition, Mr. Laitner testified that those skilled in the rupture disc art do not consider scoring to "include forming grooves in a disc by cutting, chemical e[tching], spark erosion or grinding." [24]

Dr. Cochran confirmed this distinction upon cross examination, where the following exchange took place:

Q. Cutting of a groove in metal would be removal [of] that metal. Is that not true?

A. That might be true. It might be cut with a knife blade, which would be akin to scoring. Grinding, of course, implies removal of material. Cutting implies cutting, which may imply forcing material away from its original position.

Q. Chemical etching would be removing the material, correct?

A. Yes, sir.

Q. Spark erosion would be removal of the material?

A. Yes, sir.

Q. Grinding would be removal of the material?

A. Yes, sir.

Q. And scoring is not removal of the material. Is that not true?

A. Scoring is displacement of the material—

Q. And not removal?

A. —and compression of the material.

Q. Are you saying now that cutting metal means scoring? *Those skilled in the art would know that when you say to cut the metal and give examples of etching, spark erosion and grinding, that that would mean scoring?*

A. *It might mean that, but it appears that the cutting would refer to the removal of material.*[25]

The difference between grooving and scoring was expanded further when Mr. Laitner made the following comment:

[When grooving in terms of removing material, the] material that remains has the original characteristics of the metal, whereas when you score, you not only impress a shape into the metal, a precise shape, but you work harden[] the metal underneath the score.[26]

Considering the testimony provided, it is difficult to adopt defendant's expansive defi-

---

19. Defendant's Trial Exhibit (Def.'s Ex) 99A, at 9699.

20. Tr. at 414, 423–24.

21. *Id.* at 414.

22. *Id.*

23. *Id.* at 712.

24. *Id.* at 713.

25. *Id.* at 542–43 (emphasis added).

26. *Id.* at 713.

nition of scoring. The court finds particularly persuasive the explanation regarding the characteristics of the metal below the intended line of weakness. Specifically, the court notes that the metal below that line varies between grooving and scoring. This is a significant distinction, as both parties agreed that scoring, as opposed to grooving, affects the burst characteristics of the disc.[27] Thus, rather than adopt a meaning which includes the removal of material from the disc, the court is persuaded that the term scoring, as applicable to the patent in suit, does not encompass a process whereby material is physically removed from the disc.

■ The second claim interpretation issue that must be resolved involves the meaning of the term "web means" as used in claim 1. In this regard, claim 1 discloses a "web means in substantial alignment with said scoring and in close proximity to said low pressure face for preventing rupturing of said disc under the influence of relatively high burst pressures directed against said high pressure face."[28] Plaintiff asserts that the web means consist of "intersecting, perpendicular, elongated web sections" that engage the low pressure face in substantial alignment with the score lines.[29] Defendant counters that the '180 patent does not limit web means to only a perpendicular configuration, but rather, discloses "any structure that underlies lines of weakness and runs from one side to the other of a rupture disc assembly, regardless of whether it takes the form of perpendicular pieces."[30]

■ The web means of the '180 patent must be construed in light of the means plus function limitation of 35 U.S.C. § 112, ¶ 6. The court interprets such language "to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." *Id.* The device must perform the identical function as specified in the claims of the patent in suit. *King Instruments Corp. v. Perego,* 65 F.3d 941, 945–46 (Fed.Cir.1995),

*cert. denied,* 517 U.S. 1188, 116 S.Ct. 1675, 134 L.Ed.2d 778 (1996); *see also In re Donaldson Co.,* 16 F.3d 1189, 1195 (Fed.Cir. 1994).

The claims language of the '180 patent is silent as to the exact configuration of the web means. Both parties, however, proffered testimony which explained that the web means are solid areas of the support member that: (1) span from perimeter to perimeter of the support assembly; (2) are wider than the score lines; and (3) are substantially aligned with these score lines in order to prevent rupture upon the application of a high pressure against the high pressure face of the disc.[31]

The only reference to a preferred configuration relating to perpendicular web means is found in the specification. In describing the preferred embodiment for the invention, it recites, in pertinent part:

The backing member [ ] includes a threaded sidewall [ ] permitting installation of assembly [ ] within projectile [ ], a pair of intersecting, relatively perpendicular, elongated web sections [ ], and a total of four openings [ ] therethrough [ ].[32]

Although "[r]eferences to a preferred embodiment, such as those often present in a specification, are not claim limitations," *Laitram Corp. v. Cambridge Wire Cloth Co.,* 863 F.2d 855, 865 (Fed.Cir.1988), the court "look[s] to the specification for assistance in construing a claim." *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.,* 15 F.3d 1573, 1577 (Fed.Cir.1993). Nevertheless, "particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560, 1571 (Fed. Cir.1988); *see also Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 987 (Fed.Cir.1988) ("What is patented is not restricted to the examples, but is defined by the words in the claims . . . ."). Indeed, as the United States

27. *See id.* at 545, 713.

28. Jt. Ex. 1, col. 4, ln. 67, through col. 5, ln. 4.

29. Plaintiff's Post–Trial Brief (Pl.'s Br.) at 15.

30. Defendant's [Post–Trial] Reply Brief at 3.

31. *See* Tr. at 427–31, 700–02.

32. Jt. Ex. 1, col. 3, lns. 41–45.

Court of Appeals for the Federal Circuit has explained:

> It is entirely proper to use the specification to interpret what the patentee meant by a word or phrase in the claim. But this is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.... "Where a specification does not require a limitation, that limitation should not be read from the specification into the claims."

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed.Cir. 1988) (citation omitted) (quoting *Specialty Composites*, 845 F.2d at 987).

The court does not agree with plaintiff that the web means, as used in the '180 patent, are limited to perpendicular cross members. The court will not incorporate the reference to perpendicular web means from the specification into the claims language. Rather, the claims language will apply to a structure in the support member that extends from perimeter to perimeter and whose function is to prevent rupture of the disc upon the application of a high pressure against the high pressure face of the disc.

▌ The third claim interpretation issue involves the numerical relationship of burst regions of the rupture disc with the number of openings in the support member. With regard to this relationship, claim 4 states, in pertinent part: "there being a plurality of burst regions on said disc, said backing member having an *opening* therethrough *for each* burst region." [33]

Dr. Cochran testified that the word "an" in a patent claim generally means "at least one." [34] In this regard, defendant contends that claim 4 is not limited to a 1:1 relationship of burst regions to openings in the backing member. Plaintiff, however, asserts that the relationship of burst regions to openings is limited to a 1:1 relationship.

As stated above, in construing claims, the court begins with the language of the claims. *ZMI Corp. v. Cardiac Resuscitator Corp.*,

844 F.2d 1576, 1579 (Fed.Cir.1988). Claim 4 specifically refers to "an opening" for "each burst region." There is no reference to "openings" for "each burst region," or "an opening" for "the burst regions." Moreover, "[w]hile it is generally accepted in patent parlance that 'a' [or 'an'] can mean one or more, ... there is no indication in the patent specification that the inventor[ ] here intended it to have other than its normal singular meaning." *North American Vaccine*, 7 F.3d at 1575–76 (citing Robert C. Faber, Landis on Mechanics of Patent Claim Drafting 531 (3d ed.1990)).

Indeed, the summary of the invention provides that the backing member "includes structure defining an opening through the backing member for exposing an area on the low pressure face corresponding to the rupture region." [35] The use of the term "an opening," "an area," and "the rupture region" in the singular teaches a 1:1 relationship of burst regions of the disc to openings in the backing member. *See id.* at 1576. Mr. Laitner's testimony supports such a finding. [36] Thus, the court concludes that claim 4 discloses a 1:1 relationship of burst regions to openings in the backing member.

## II. *Validity*

▌ A patent is presumed valid. 35 U.S.C. § 282 (1994). The presumption of validity places the burdens of going forward and of persuasion upon the party asserting invalidity. *Checkpoint Sys., Inc. v. United States Int'l Trade Comm'n*, 54 F.3d 756, 761 (Fed.Cir.1995); *SSIH Equip. S.A. v. United States Int'l Trade Comm'n*, 718 F.2d 365, 375 (Fed.Cir.1983). The party asserting invalidity bears the burden of establishing, by clear and convincing evidence, facts which support the ultimate legal conclusion of invalidity. *National Presto Indus. v. West Bend Co.*, 76 F.3d 1185, 1189 (Fed.Cir.1996); *see also Checkpoint*, 54 F.3d at 761; *Innovative Scuba Concepts, Inc. v. Feder Indus.*, 26 F.3d 1112, 1115 (Fed.Cir.1994); *Ryko Mfg. Co. v.*

---

**33.** *Id.*, col. 6, lns. 4–6 (emphasis added).

**34.** Tr. at 433.

**35.** Jt. Ex. 1, col. 2, lns. 21–24.

**36.** *See* Tr. at 728, 731.

*Nu–Star, Inc.*, 950 F.2d 714, 715–16 (Fed.Cir. 1991).

▮▮▮▮ Proof by clear and convincing evidence is an intermediate standard which imposes a heavier burden than proof by preponderant evidence and a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt. *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed.Cir.1993); *see also Buildex Inc. v. Kason Indus.*, 849 F.2d 1461 (Fed.Cir.1988). Clear and convincing evidence produces in the mind of the trier of fact "an abiding conviction that the truth of [the] factual contentions are 'highly probable.'" *Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed.Cir. 1991) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984)).

### A. Anticipation

▮▮▮ Defendant first argues that claims 1 and 4 of the '180 patent are anticipated by U.S. Patent No. 3,845,879 (Dernbach). According to defendant, each and every element as set forth in these claims is found in Dernbach. Plaintiff contends that neither claim is anticipated. In particular, plaintiff maintains that claim 1 of the '180 patent calls for scoring of the high pressure face of the disc while Dernbach calls for grooves created by methods of cutting metal, such as chemical etching, spark erosion, or grinding. A copy of the Dernbach patent is located in Appendix B to the court's opinion.

▮▮▮▮ Anticipation under 35 U.S.C. § 102(b) requires each and every element of the patent in suit to be found in a single prior art. *Kegel Co. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1429 (Fed.Cir.1997); *see also Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed.Cir.1995); *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed.Cir. 1987). Anticipation is a question of fact. *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed.Cir.1995). "'[C]laims must be interpreted and given the same meaning for purposes of both validity and infringement analyses.'" *Kegel Co.*, 127 F.3d at 1429 (quoting

*SmithKline Diagnostics v. Helena Laboratories Corp.*, 859 F.2d 878, 882 (Fed.Cir.1988)).

▮▮▮▮ In an anticipation analysis, "the claims are read in the context of the patent specification in which they arise and in which the invention is described." *Glaverbel*, 45 F.3d at 1554. To anticipate a claim, a prior art reference must, either expressly or inherently, disclose each limitation of the claim. *Rowe v. Dror*, 112 F.3d 473, 478 (Fed.Cir. 1997). If even one element is missing from the prior art, there can be no finding of anticipation. *Tate Eng'g, Inc. v. United States*, 201 Ct.Cl. 711, 477 F.2d 1336, 1342 (1973); *see also Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1571 (Fed.Cir. 1986) ("[A]bsence from the reference of any claimed element negates anticipation").

Dernbach concerns a safety fitting for pipes or vessels that withstands a relatively high pressure from one direction and ruptures at a relatively low pressure from the opposite direction. The preferred embodiment of the patent discloses an application in a typical cooling system for a water-moderated and water-cooled nuclear reactor. Within the cooling system of the reactor, the grooved rupture disc is placed on the normal system side and is supported by a backing member located on the emergency system side. The backing member contains a plurality of holes, wherein the pattern of the holes is situated so as to leave solid areas which provide support for the grooved portions of the disc. Dernbach further provides:

> As long as normal pressure is maintained the disc is kept from rupturing. However, if a small differential pressure exists such that the emergency pressure is higher than the normal pressure, the disc will rupture and permit the fluid from the emergency system to flow into the normal system.[37]

Specifically, the claims of Dernbach state, in pertinent part:

1. A safety fitting for use in pipe lines and the like comprising:

 a. a substantially flat rupture disc containing a plurality of radial grooves

---

37. Jt. Ex. 2, col. 1, lns. 39–44.

extending from the center to a predetermined distance from the rim of the disc thereby leaving an [sic] annular area of undiminished cross sections near the rim;

b. a support member having a plurality of holes therein patterned so as to provide solid areas corresponding to the location of the grooves in said rupture disc; and

c. means to support said rupture disc and said support member within a pipe line with said rupture disc resting against said support member with its grooves aligned with the solid areas of said support member, and facing the side of said pipe line in which a normally higher pressure is expected, whereby a higher pressure on said normal side of said line will press said rupture disc against said support member and prevent flow through the safety fitting but a higher pressure on the support member side of said safety fitting will cause said disc to rupture along said grooves and permit a flow through said safety fitting.[38]

Claim 1 of the '180 patent calls for a frangible disc presenting a low pressure face, an opposed high pressure face, and a backing member adjacent to the low pressure face. Dernbach similarly discloses such a configuration. Specifically, Dernbach provides for a rupture disc which separates a normal pressure cooling system from an emergency pressure cooling system, and is "backed by a support member with the disc on the normal system [side]."[39] This "normal system side" is equivalent to the high pressure side of the '180 patent.[40]

Claim 1 further calls for "scoring on said high pressure face."[41] As the court concluded above, scoring refers to reducing the thickness of a material along a line to weaken it purposely along that line. Moreover, the court interpreted that the definition of scoring does not encompass a process whereby material is physically removed from the disc. The specification of Dernbach, however, provides that:

> Grooves [ ] may be made by any of the known methods of cutting metals. Chemical etching and spark erosion methods have been found to be particularly suitable. However, grinding is also possible.[42]

Dr. Cochran conceded that these methods of grooving, or cutting, all involve the removal of material from the disc.[43] He further conceded that Dernbach makes no mention of scoring.[44] Thus, because Dernbach specifies grooves which require the removal of material from the disc, and the '180 patent does not make such a disclosure, the '180 patent is not anticipated by Dernbach. Nevertheless, the court will consider whether the remainder of claim 1, as well as claim 4, are anticipated by Dernbach.

Claim 1 of the '180 patent also provides for "web means in substantial alignment with said scoring and in close proximity to said low pressure face for preventing rupturing of said disc under the influence of relatively high burst pressures against said high pressure face."[45] The court interprets this "language 'to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.'" *King Instruments*, 65 F.3d · at 945 (quoting 35 U.S.C. § 112). "To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of claimed function for that structure." *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934 (Fed.Cir.1987).

Mr. Laitner explained that the web means support the disc from deflecting in response to high pressure and "support respective

38. *Id.*, col. 6, lns. 2–25.

39. *Id.*, col. 2, lns. 45–47.

40. *See* Tr. at 169–70.

41. Jt. Ex. 1, col. 4, lns. 62–63.

42. Jt. Ex. 2, col. 4, lns. 34–38.

43. *See* Tr. at 542–43.

44. *See id.* at 541.

45. Jt. Ex. 1, col. 4, ln. 67, through col. 5, ln. 3.

score lines." [46] Dr. Cochran further explained that, in comparing the web means of claim 1 of the '180 patent with the solid areas of the support member of Dernbach, that both "support the grooved or scored portions of the disc to keep the disc from rupturing under relatively high pressure applied against the high pressure face." [47]

As the court noted earlier, this portion of claim 1 applies to a structure in the support member that extends from perimeter to perimeter and whose function is to prevent rupture of the disc upon the application of a high pressure against the high pressure face of the disc. The court is thus satisfied that the solid areas of the support member in Dernbach perform the same function as the web means of the '180 patent.

Nevertheless, this portion of claim 1 is not anticipated by Dernbach. Significantly, claim 1 of the '180 patent provides that the web means shall be in substantial alignment with the scoring. As the court concluded above, however, Dernbach does not disclose scoring. Thus, Dernbach can not provide web means in substantial alignment with the referenced scoring. Accordingly, claim 1 of the '180 patent is not anticipated by Dernbach.

Defendant next argues that claim 4 of the '180 patent is anticipated by Dernbach. Claim 4 provides for "a plurality of burst regions on said disc, said backing member having an opening therethrough for each burst region." [48] As the court concluded above, this claim discloses a 1:1 relationship of burst regions to openings in the backing member.

Dernbach claims "a support member having a plurality of holes therein patterned so as to provide solid areas corresponding to the location of the grooves in said rupture disc." [49] The regions defined by the grooves on the disc of Dernbach correspond to the burst regions of the disc of the '180 patent. The claims language of Dernbach, however,

does not specify the number of holes in the support member which correspond to each burst region.

The specification of Dernbach furnishes direction in determining this relationship. Specifically, the preferred embodiment calls for a support member "contain[ing] a plurality of holes [ ] causing it to have a *sieve like* appearance. The pattern of holes [ ] is such that there are solid areas upon which the grooved portions of the rupture disc ... may rest." [50] The corresponding figures, which provide guidance regarding the number of holes in the support member, indicate a relationship of ten holes situated within each burst region. [51]

A sieve is defined as: "a device with meshes or perforations through which finer particles of a mixture ... of various sizes are passed to separate them from coarser ones...." Webster's New Collegiate Dictionary 1078 (G. & C. Merriam Co.1977). In calling for the holes in the support member to have a "sieve like" appearance, the specification teaches toward a configuration where a number of holes correspond to each burst region. Indeed, it would take more than one hole in each burst region in order to give the appearance of being "sieve like." *See E.I. du Pont de Nemours,* 849 F.2d at 1433 ("It is entirely proper to use the specification to interpret what the patentee meant by a word or phrase in the claim"). Thus, the court concludes that Dernbach calls for more than a 1:1 relationship of holes in the support member for each burst region. Accordingly, claim 4 of the '180 patent is not anticipated by Dernbach.

Defendant next argues that claims 1 and 4 of the '180 patent are anticipated by a disc assembly manufactured by Starline Engineering Company (Starline) in 1965. An inventor loses the right to his patent if he has placed his invention "in public use or on sale in this country, more than one year prior to the date of the appli-

**46.** *See* Tr. at 702.

**47.** *Id.* at 430.

**48.** Jt. Ex. 1, col. 6, lns. 4–6.

**49.** Jt. Ex. 2, col. 6, lns. 9–12.

**50.** *Id.,* col. 4, lns. 50–54 (emphasis added).

**51.** *Id.* at Fig. 5.

cation for patent in the United States." 35 U.S.C. § 102(b). When asserting invalidity under the on-sale bar, defendant must demonstrate that "there was a definite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully · anticipated the claimed invention." *UMC Elecs. Co. v. United States,* 816 F.2d 647, 656 (Fed.Cir.1987); *see also Ferag AG v. Quipp Inc.,* 45 F.3d 1562, 1566 (Fed.Cir. 1995); *Envirotech Corp. v. Westech Eng'g Inc.,* 904 F.2d 1571, 1574 (Fed.Cir.1990).

The determination that a product was placed on sale under § 102(b) is a question of law, based on underlying facts. *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 549 (Fed.Cir.1990); *Ferag AG,* 45 F.3d at 1566. Although a wide variety of factors may influence the on-sale determination, no single one factor controls the application of § 102(b); the ultimate conclusion depends on the totality of the circumstances. *Ferag AG,* 45 F.3d at 1566. "That the offered product is in fact the claimed invention may be established by any relevant evidence, such as memoranda, drawings, correspondence, and testimony of witnesses." *RCA Corp. v. Data Gen. Corp.,* 887 F.2d 1056, 1060 (Fed.Cir.1989).

In 1965, Rocketdyne, a division of North American Aviation, Inc., ordered twenty disc assemblies from Starline. These units, called "line mounted diaphragm assemblies," were ordered for use in a Navy missile called "Project Condor." Starline invoiced Rocketdyne for the assemblies in January 1965. Moreover, the invoice provided by Starline referenced an assembly numbered 65A725.[52]

Defendant argues that Starline assembly number 65A725, in conjunction with a number of other Starline drawings, anticipate the patent in suit. Specifically, defendant maintains that all the elements of claims 1 and 4 of the '180 patent are found either expressly or inherently in the disc assembly manufactured by Starline. Plaintiff counters that the Starline assembly should not be considered prior art "because it [is] impossible to deter-

mine the nature of the assembly allegedly offered for sale."[53] Plaintiff asserts that many of the parts drawings are "unsigned, unapproved, and inconsistent with the assembly drawing, making it impossible to determine what if anything was actually shipped."[54]

The court notes that a physical embodiment is not required for an on-sale bar analysis. *Pfaff v. Wells Electronics, Inc.,* 124 F.3d 1429, 1434 (Fed.Cir.1997), *cert. granted,* —— U.S. ——, 118 S.Ct. 1183, 140 L.Ed.2d 315 (1998); *Robotic Vision Sys., Inc. v. View Eng'g, Inc.,* 112 F.3d 1163, 1167 (Fed.Cir.1997). Instead, the court looks to whether the invention was substantially complete at the time of sale. *See Micro Chem., Inc. v. Great Plains Chem. Co.,* 103 F.3d 1538, 1545 (Fed.Cir.1997), *cert. denied,* —— U.S. ——, 117 S.Ct. 2516, 138 L.Ed.2d 1018 (1997) ("[A] sale or a definite offer to sell a substantially completed invention, with reason to expect that it would work for its intended purpose upon completion, suffices to generate a statutory bar"). Indeed, the invention need not even "be in a commercially satisfactory stage of development." *Scott v. Finney,* 34 F.3d 1058, 1061–62 (Fed.Cir. 1994). In order for a patent to be invalid under § 102(b), the claimed invention asserted to have been on sale must be substantially completed with reason to expect it would work for its intended purpose. *Micro Chem.,* 103 F.3d at 1545. Thus, notwithstanding plaintiff's argument that Starline does not constitute prior art, the court will consider the Starline drawings to determine whether they invalidate plaintiff's patent. The Starline drawings, numbers: (i) 65A722, (ii) 65A724, and (iii) 65A725 are located in Appendix C to the court's opinion.

Dr. Cochran testified extensively in describing the claims of the '180 patent and how they are found in the Starline drawings. With regard to claim 1, Dr. Cochran explained that the rupture disc assembly can be found in drawing number 65A725, whereby the disc "is represented by the parallel verti-

---

**52.** Def.'s Ex. 128.

**53.** Pl.'s Br. at 19.

**54.** *Id.*

cal lines relatively close together, . . . [with the] high pressure face of the disc [on the] right-hand side, and the low pressure face of the disc [on] the left-hand side." [55] He further expounded that the scoring of claim 1 is located on the disc referenced in drawing number 65A724, and delineated by "partial circumferential lines" and by lines that are directed across the center of the disc.[56]

With respect to these score lines, Dr. Cochran referred to U.S. Patent No. 3,195,-769, ('769 patent) which was referenced in drawing number 65A724.[57] Dr. Cochran referred to the '769 patent in explaining that:

> The score pattern here is what is referred to in the art as the double leaf pattern. It contains a partial circumferential—it is composed of a partial circumferential scoring around the circumference of the disc a certain distance in from the edge of the disc and in such a way that solid areas are left in this circumferential scoring for hinges for two leaves, if you will, that open up.[58]

He further testified that drawing number 65A724 demonstrates that the scoring is disposed at least partially about a rupture region, delineating two rupture regions, one at the top and one at the bottom of the disc.[59]

With regard to the web means of claim 1, Dr. Cochran testified that, in drawing number 65A722, the web means are the solid portions of the backing member that extend horizontally. He further elaborated that the web means of the Starline assembly include "the annulus or annular region around the edge . . . because it supports the partially circumferential grooves that are in the rupture disc." [60]

Drawing number 65A722, however, includes a solid portion extending vertically through the backing member that is both perpendicular, and identical, to the horizontal web means identified by Dr. Cochran. Interestingly, he did not identify this member as a

web means. Nevertheless, the court considers this portion of the backing member to be a portion of the web means. As the court stated earlier, the web means include a structure in the support member that extends from perimeter to perimeter and whose function is to prevent rupture of the disc upon the application of a high pressure against the high pressure face of the disc. Because the vertical and horizontal cross members are indistinguishable, the court considers both to be part of the web means.

Dr. Cochran further testified that the web means of the Starline assembly are in substantial alignment with the scoring on the disc. In particular, he stated that "[t]he scoring which cuts across the face of the disc that is shown in [drawing number] 65A725 is supported by the web means shown in [drawing number] 65A722, which goes across from left to right of the downstream phase of the support member." [61]

The '180 patent requires "web means in substantial alignment with said scoring." [62] The web means of the Starline assembly provides perpendicular web means that run from perimeter to perimeter. The scoring on the disc, however, discloses, in addition to the circumferential scoring described above, only horizontal scoring. In this regard, the support member provides a vertical web means without a corresponding score line in the rupture disc. Thus, this portion of claim 1 of the '180 patent is not disclosed in the Starline assembly. Accordingly, claim 1 is not invalidated by Starline.

Dr. Cochran also testified that claim 4 of the '180 patent is found in the Starline assembly. According to Dr. Cochran:

> [there are] four openings as shown in [d]rawing [number] 65A722 . . . [and there] are two rupture regions [in the disc] at least partially delineated by coin grooves. . . . We have two leaves or petals

**55.** Tr. at 454.

**56.** *Id.*

**57.** *See* Jt. Ex. 45.

**58.** Tr. at 455.

**59.** *Id.* at 458.

**60.** *Id.* at 460.

**61.** *Id.* at 461.

**62.** Jt. Ex. 1, col. 4, lns. 67–68.

which open up in the rupture disc. For each of the rupture regions, you have actually in this design two openings as you would see if you took the disc, which is shown in [drawing number] 65A724, and placed it upon the support member shown in [drawing number] 65A722.[63]

Dr. Cochran's explanation results in a 1:2 relationship of burst regions on the disc to openings in the support member. The court has already concluded that claim 4 of the '180 patent requires a 1:1 relationship. Thus, claim 4 is not invalidated by the Starline assembly.

### B. *Obviousness*

■ Defendant next argues that claim 5 of the '180 patent is invalid for obviousness in light of the Dernbach patent, the Starline assembly, and U.S. Patent No. 3,484,817 issued to L.E. Wood (the Wood '817 patent).[64] Claim 5 provides for a rupture disc containing burst regions "having a concavo-convex face of each portion extending into the corresponding member opening."[65] Defendant maintains that, although Dernbach and Starline do not disclose a rupture disc with several concavo-convex portions, bulging of the disc was conventional in 1982 and a person of ordinary skill in the art would have been motivated to pre-bulge the disc. Moreover, defendant avers that the teachings of the Wood '817 patent demonstrates the desirability of a rupture disc with bulges and score lines.

■ A patent is invalid for obviousness if the differences between the claimed invention as a whole and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103. Obviousness is a determination of law based on underlying determinations of fact. *See Richardson–Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed.Cir.1997). These factual determinations include: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) secondary considerations, if any, of non-obviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). These factual findings guide the determination of whether the patented subject matter would have been obvious to one of ordinary skill in the art at the time of the invention. *Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 890 (Fed.Cir.1984).

■ The scope of the relevant prior art includes art "'reasonably pertinent to the particular problem with which the inventor was involved.'" *In re GPAC Inc.*, 57 F.3d 1573, 1577 (Fed.Cir.1995) (quoting *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1535 (Fed.Cir.1983)). "References that are not within the field of the inventor's endeavor may also be relied on in patentability determinations, and thus are described as 'analogous art', when a person of ordinary skill would reasonably have consulted those references and applied their teachings in seeking a solution to the problem that the inventor was attempting to solve." *Id.* (quoting *Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., Inc.*, 21 F.3d 1068, 1071 (Fed.Cir.1994) (citation omitted)).

In the case at bar, the inventor was confronted with the problem of developing a disc that possessed the seemingly inconsistent characteristic of being able to withstand a relatively high pressure in one direction, and then burst upon the application of a relatively low pressure from the opposite direction. Both the Dernbach patent and the Starline assembly possess this characteristic.

The Wood '817 patent also possesses this characteristic. In this regard, the Wood '817 patent concerns "[a] safety relief device including a concave-convex rupture disc with lines of weakness on its concave or convex side."[66] The patent thus teaches the desirability of bulging and scoring a rupture disc. Significantly, however, the Wood '817 patent is a reverse buckling disc. Mr. Laitner ex-

---

63. Tr. at 463.

64. *See* Jt. Ex. 46.

65. Jt. Ex. 1, col. 6, lns. 7–9.

66. Jt. Ex. 46, col. 1, lns. 12–14.

plained that, with a reverse buckling disc, if "you applied pressure to the convex side of the disc, ... the disc would reverse ... because of the pre-weakening of the scores that are on the dome."[67] Dr. Cochran testified that the bulges in the disc of the '180 patent, however, do not reverse.[68] Thus, the Wood '817 patent is useful only to the extent that it teaches that score lines and pre-bulging can be used to create particular burst characteristics in a disc.

The testimony elicited at trial indicates that the level of ordinary skill in rupture disc art, as of the early 1980's, would include someone who may or may not have a Bachelor's Degree.[69] In addition, that individual "might also include someone with a [doctorate] or other advanced degree."[70] Regardless of the level of education achieved, however, the individual would have considerable experience in the manufacturing, designing, and testing of rupture disc assemblies.[71] With respect to this experience, an individual of ordinary skill in the art would be familiar with techniques for: (1) metal processing; (2) work hardening of metals; (3) elastic and plastic deformation of metals; (4) disc bulging; and (5) characteristics of materials as they respond to bulging.[72]

The court notes, however, that in developing this construct, Dr. Cochran acknowledged that he had limited experience in the rupture disc art. Specifically, Dr. Cochran confirmed this lack of experience upon cross examination, where the following exchange took place:

Q. [Y]ou have not conducted or participated in any tests regarding rupture disc assemblies at all? Is that a fair statement?

A. That's a fair statement, yes.

\* \* \* \*

Q. Is it fair to also say that you have not consulted with anyone skilled in the rupture disc art in preparation for your testifying here at trial?

A. I haven't consulted with anyone directly who is in the business of making rupture disc and rupture disc assemblies. No, sir.

\* \* \* \*

Q. Have you consulted with anyone that you would deem to be skilled in the rupture disc art? Have you consulted with anyone in preparation for your testimony here at trial? Consulted? Talked with them?

A. No sir, not that I can think of.[73]

Based upon this exchange, the court finds Dr. Cochran's testimony less credible on the issue of obviousness than that of Mr. Laitner, who, by contrast, testified that he has extensive experience in the rupture disc art, and has consulted with numerous artisans who are individuals of ordinary skill in the art. *See Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1545–46 (Fed.Cir.1987) (credibility determinations of competing expert witnesses is left to the discretion of the trial court); *see also Moxness Prods., Inc. v. Xomed, Inc.*, 891 F.2d 890, 893 (Fed.Cir. 1990) ("the court [is] free to weigh the evidence and assess witnesses' credibility").

With regard to the differences between claim 5 and the prior art, it is beyond dispute that the prior art does not include a preformed, multi-bulged, and scored rupture disc with each bulge protruding into a corresponding opening in the backing member. Nevertheless, Dr. Cochran testified "that a person of ordinary skill in the art would know that when high pressure is applied to a thin rupture disc, then the disc will bulge in

---

67. Tr. at 763–64.

68. *Id.* at 563.

69. *Id.* at 181, 741.

70. *Id.* at 181.

71. *Id.* at 741.

72. *Id.* at 800–01.

73. *Id.* at 516–19. Dr. Cochran did, however, state:

I have read depositions of people who were involved in making rupture discs, selling rupture discs and developing rupture disc business and all these things. I have taken what they said about people having ordinary skill in the art, and that plays a big role in what I have in my own mind as a composite person that fills that role.
*Id.* at 520.

areas where it is not supported." [74] He further testified that this person would be motivated to form bulges in the rupture regions to allow for a very high withstand pressure. According to Dr. Cochran, one skilled in the art would see that a high pressure against the high pressure side of the disc would cause the disc to bulge, and thus one skilled in the art would know that pre-bulging the disc would enable it to have particularly specified burst characteristics in the opposite direction.[75]

Moreover, Dr. Cochran explained that the German version of the Dernbach patent (German Dernbach patent) teaches that "the disc will deform to some extent into the openings." [76] According to Dr. Cochran, a person of ordinary skill in the art:

> would know that bulges would form, and they would form based on the amount of withstand pressure in the material of the disc and the size of the holes and some other design parameters. If they chose certain types of materials for certain operating pressures and they had certain sizes of openings, then they would know that a fairly substantial bulge might form, and then they would pre-bulge.[77]

By contrast, Mr. Laitner proffered testimony regarding the unique characteristics of the rupture disc as embodied in claim 5. Specifically, he explained that the purpose of the bulging is to create pressure between the flat, scored portion of the disc with the adjacent web means. With respect to this pressure, he expounded:

> This high pressure loading essentially causes the bulges to lock into those openings and causes the force from the response to pressure to be applied against the disc perimeter through the perimeter support and against the disc assembly through the web means ... with essentially no stress at the scored portion of the disc because of the design of the disc.[78]

Mr. Laitner further clarified this explanation by stating: "the bulge provides a significant stiffening of that very thin disc in the rupture region." [79] In addition, Mr. Laitner distinguished the teachings of the German Dernbach patent, and testified that the patent actually teaches away from pre-bulging a rupture disc.

The German Dernbach patent provides that "the rupture disc is preferably flat.... The thickness of the rupture disc and the diameter of the bore holes of the support are dimensioned in such a manner that under operating pressure and temperature of the rupture disc will form at most a slight knob above the bore holes, but will not crack." [80] With regard to the relationship of the rupture disc and the holes, Mr. Laitner explained:

> Both are dimensioned, the thickness of the disc and the diameter, in such a manner that under operating pressure and temperature the rupture disc will form at least slight knobs above the bore holes, but will not crack. The significant thing they are teaching is it will not crack.... *They are teaching [to] stay away from that where you get bulges.... [The disc] has to be strong enough that it doesn't punch through.* How strong does it have to be? Well, at least thick enough and strong enough that at the most you'll get very slight knobs. Don't go beyond that or you're going to be in trouble because if you get bulges you're going to have problems with your disc.[81]

In order for a claim to be invalid for obviousness over a combination of references, there must have been a motivation to combine the prior art references to produce the claimed invention. *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.,* 730 F.2d 1452, 1462 (Fed.Cir.1984). There must be some teaching, suggestion, or motivation to combine the references. *In re*

---

74. *Id.* at 434.

75. *See id.* at 438–39.

76. *Id.* at 944.

77. Tr. at 945–46.

78. Tr. at 716.

79. *Id.* at 720.

80. Def.'s Ex. 3, at 9604.

81. Tr. at 756–57 (emphasis added).

*Geiger*, 815 F.2d 686, 688 (Fed.Cir.1987). In the present case, however, the German Dernbach patent does not teach toward pre-bulging the rupture disc. Rather, the specification suggests a "preferably flat" disc where the thickness of the disc and the diameter of the boreholes will be dimensioned so as to form, *at the most*, slight knobs. This language teaches that the formation of bulges would be an undesirable result and should be avoided. Moreover, Mr. Laitner stated that the small knobs that were formed would have no effect whatsoever on the burst characteristics of the disc.[82] This is a significant distinction, as the bulges of the patent in suit have specific and unique burst characteristics.

With regard to these burst characteristics, Mr. Laitner testified:

> The bulges in the [']180 patent are so unique in the way they respond compared to the prior art. In the prior art, if you had a bulge that was in a forward acting disc and you applied pressure on the concave side to create a tension in the dome of the disc and you expected the dome to burst, that would be one thing. That is what people were familiar with.

> To use the '180 patent and have a dome that does not respond to pressure and does not burst was completely opposite of what people with ordinary skill in the art would think of.[83]

The court is persuaded that pre-bulging the disc in the manner disclosed in claim 5 was not obvious to those skilled in the art. Although defendant has proffered testimony establishing that bulging and scoring were known to those skilled in the art in the early 1980's, it has not shown, by clear and convincing evidence, that claim 5 is invalid for obviousness. Indeed, defendant has not proffered any testimony teaching that preforming multiple bulges in a disc, as disclosed in claim 5, creates the unique burst characteristics of the '180 patent.

The final criterion the court must consider in an obviousness analyses is objective evidence of nonobviousness. Objective evidence of nonobviousness must be considered, if present. This type of evidence includes: (1) the commercial success of the patented invention; (2) whether the invention addresses "long felt but unsolved needs;" and (3) the failure of others to produce alternatives to the patented invention. *GPAC*, 57 F.3d at 1580 (quoting *Graham*, 383 U.S. at 17–18, 86 S.Ct. 684).

The commercial success of the '180 patent is evident from defendant's use of the rupture disc assembly in the Javelin missile. Moreover, although defendant maintains that the '180 patent does not address a "long felt but unresolved need," that assertion is belied by the extensive testing and experimentation involved in the '180 patent. Specifically, defendant argues that "no need existed prior to the Javelin missile application[; and when] the need arose for a device that could withstand a relatively high pressure from one direction and rupture at a relatively low pressure from the opposite direction, that need was readily satisfied." [84]

This argument has little merit. Lester L. Fike, Jr., chief executive officer and chairman of the board for plaintiff, who has extensive experience in the rupture disc field, testified regarding his reaction when he learned about the rupture disc assembly designed by Mr. Hinrichs:

> I became very excited because I had never seen a rupture disc that could withstand a back pressure of 30 to one. That was pretty, pretty darn exciting.[85]

Mr. Fike further testified that this thirty to one ratio was a tremendous improvement as compared with earlier rupture discs, which had a ratio of "something with maybe a three to one ratio." [86] By contrast, defendant did not present evidence of any other rupture discs that came close to the performance ratio demonstrated by the '180 patent.

---

**82.** *Id.* at 760.

**83.** *Id.* at 763.

**84.** Defendant's Post–Trial Brief at 25.

**85.** Tr. at 661.

**86.** *Id.* at 662.

Thus, the objective evidence militates toward a finding of nonobviousness.

Defendant has not demonstrated that claim 5 would have been obvious to one of ordinary skill in the art at the time of the invention. Indeed, the court is persuaded that it would not have been obvious to pre-bulge and score the rupture disc in order to attain the high withstand to burst pressure ratio as embodied in the '180 patent. Accordingly, the court concludes that the '180 patent is not invalid for obviousness.

## C. Best Mode Requirement

 Finally, defendant asserts that plaintiff failed to disclose a preferred method of practicing its invention at the time the patent application was filed. Defendant maintains that, in producing the rupture disc, plaintiff was aware that it was important to bulge the disc before scoring it. According to defendant, reversing the process could weaken the disc and may prevent it from satisfying various performance requirements. Despite this knowledge, defendant asserts that the specification of the '180 patent does not adequately disclose the best mode in sufficient detail to allow those with ordinary skill in the art to practice it.

The specification must "set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112. "[T]he sole purpose of the best mode requirement 'is to restrain inventors from applying for patents while at the same time concealing from the public preferred embodiments of their inventions which they have in fact conceived.' " Glaxo Inc. v. Novopharm Ltd., 52 F.3d 1043, 1049 (Fed.Cir.1995) (quoting Chemcast Corp. v. Arco Indus., 913 F.2d 923, 926 (Fed.Cir.1990)). A determination of whether a patent complies with the best mode requirement involves a two-step inquiry:

> The first is whether, at the time the inventor filed his patent application, he knew of a mode of practicing his claimed invention that he considered to be better than any other. This part of the inquiry is wholly subjective, and resolves whether the inventor must disclose any facts in addition to those sufficient for enablement. If the inventor in fact contemplated such a preferred mode, the second part of the analysis compares what he knew with what he disclosed—is the disclosure adequate to enable one skilled in the art to practice the best mode or, in other words, has the inventor "concealed" his preferred mode from the "public"? Assessing the adequacy of the disclosure, as opposed to its necessity, is largely an objective inquiry that depends upon the scope of the claimed invention and the level of skill in the art.

Chemcast, 913 F.2d at 927–28; see also United States Gypsum Co. v. National Gypsum Co., 74 F.3d 1209, 1212 (Fed.Cir.1996).

 The patent need not disclose "production details." Young Dental Mfg. Co. v. Q3 Special Prods., Inc., 112 F.3d 1137, 1144 (Fed.Cir.1997) (quoting Wahl Instruments, Inc. v. Acvious, Inc., 950 F.2d 1575, 1579–80 (Fed.Cir.1991)). Rather, the "inventor need only disclose information about the best mode that would not have been apparent to one of ordinary skill in the art. Because routine details are apparent to one of ordinary skill, they need not be disclosed." Id.

The parties stipulate that "[Mr.] Hinrichs was aware that by scoring the disc after pre-bulging, there would not be any movement in the material after scoring which could crack the score and cause a leak in the score line, thus making it important to score the disc after pre-bulging."[87] Defendant maintains that the '180 patent is silent regarding this procedure. Defendant further asserts that pre-bulging and then scoring was not a routine production detail by those skilled in the art at the time plaintiff filed its patent application.

In support of this position, Dr. Cochran testified regarding U.S. Patent No. 5,160,070 (the '070 patent), which is owned by plaintiff.[88] The '070 patent, although issued to plaintiff on November 3, 1992, references a bulged rupture disc from the early 1970's

---

87. Stip. at ¶ 39.

88. Def.'s Ex. 5.

that was scored prior to being bulged.[89] Dr. Cochran further testified about U.S. Patent No. 3,921,556 (the '556 patent), issued on November 25, 1975.[90] According to Dr. Cochran, the '556 patent requires "a process of bulging and scoring and then re[-]forming or re[-]bulging."[91] Defendant thus maintains that, because the prior art is ambiguous, bulging before scoring was not a routine production detail.

The specification of the '180 patent does not specifically disclose the order of bulging and scoring as it relates to the disc. Routine production details that are known to those skilled in the art, however, need not be disclosed. In this regard, plaintiff proffered testimony from two individuals with extensive experience in the rupture disc art. Specifically, plaintiff presented the deposition testimony of Robert J. Doelling, vice president of Engineering for Continental. Mr. Doelling stated that:

> It is pretty much common practice to always bulge a solid metal tension type disc at a pressure higher than what is expected to see in service. So that in a service condition you would not be moving it further. In this case it goes beyond that. In fact, we want to do that operation prior to forming, impressing the scores into the disc, such that we're trying to move or stretch the material after it has been scored. *We do all that forming prior to scoring.*[92]

In addition, Mr. Laitner testified that it was routine practice in 1982 to bugle a disc and then score it. Mr. Laitner explained, rather persuasively:

> The major metal deformation from the bulging would tend to pull metal towards the dome as the bulging takes place. If

there was already a score in the flat of the disc, it would tend to put strain on the score and potentially break it or certainly weaken it, so the preferred method would be to do the major metal deformation, the draw or the bulge, first and then to score.[93]

In support of this explanation, Mr. Laitner referred to the Metals Handbook, 8th Edition, which explains that, as far back as 1969, "in bulging and scoring a disc you would typically do the major metal deformation first, the bulge, and then it would be routine to do the coining or the scoring after that."[94]

Defendant must demonstrate that the '180 patent fails to disclose the best mode by clear and convincing evidence. *See Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1064 (Fed.Cir.1998). Defendant has not met its burden. Notwithstanding defendant's argument that the prior art references confuse the issue of whether to bulge and then score, or vice versa, the court is persuaded that a routine production detail indeed existed in the art. Someone of ordinary skill in the art would have known that bulging the disc should be done prior to scoring. Thus, it was not necessary for the specification to disclose this sequence. Accordingly, the '180 patent is not invalid for failure to disclose the best mode.

### Conclusion

For the above reasons, the court concludes that plaintiff's patent is valid. The parties are directed to file a joint status report by October 1, 1998, indicating further proceedings in this case.

---

89. *Id.,* col. 2, lns. 13–25.

90. Jt. Ex. 54.

91. Tr. at 484.

92. Deposition of Robert J. Doelling, filed January 14, 1998, at 66–67 (emphasis added).

93. Tr. at 791.

94. *Id.* at 793; *see also* Def.'s Ex. 99B, at 9735.

Appendix A

# United States Patent [19]

Hinrichs

[11] Patent Number: 4,505,180

[45] Date of Patent: Mar. 19, 1985

[54] HIGH REVERSE PRESSURE RESISTANT LOW FORWARD BURST PRESSURE RUPTURE DISC ASSEMBLY

[75] Inventor: James O. Hinrichs, Odessa, Mo.

[73] Assignee: Fike Metal Products Corporation, Blue Springs, Mo.

[21] Appl. No.: 553,258

[22] Filed: Nov. 18, 1983

[51] Int. Cl.³ .................... F41F 3/04; F16K 17/40; B65B 25/00

[52] U.S. Cl. .................... 89/8; 137/68 R; 220/89 A

[58] Field of Search .................... 89/1.703, 1.704, 8, 89/1 R; 220/89 A; 137/68 R, 68 A, 69, 797; 222/541

[56] References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,523,068 | 9/1950 | Simpson et al. | 220/89 A |
| 3,109,553 | 11/1963 | Fike et al. | 220/89 A X |
| 3,123,250 | 3/1964 | Lemmer | 220/89 A |
| 3,445,032 | 5/1969 | Raidl et al. | 220/89 A |
| 3,698,598 | 10/1972 | Wood et al. | 137/68 R X |
| 3,722,734 | 3/1973 | Raidl | 220/89 A |
| 3,881,629 | 5/1975 | Shaw et al. | 137/68 R X |
| 3,921,556 | 11/1975 | Wood et al. | 220/89 A X |
| 4,207,913 | 6/1980 | Fike | 220/89 A X |
| 4,434,905 | 3/1984 | Ou et al. | 137/69 X |

Primary Examiner—David H. Brown
Attorney, Agent, or Firm—Schmidt, Johnson, Hovey & Williams

[57] ABSTRACT

A rupture disc assembly is provided having the seemingly inconsistent properties of resisting relatively high burst pressures in one direction, while rupturing upon experiencing relatively low pressures in the opposed direction. The assembly includes a metallic, frangible disc having a low pressure face and an opposed, scored high pressure face, along with an apertured backing member positioned adjacent the low pressure face; the backing member includes webs aligned with the disc scoring which engage the low pressure face and prevent disc rupture under the influence of high burst pressures directed against the remote high pressure face, while permitting disc rupture when the relatively low burst pressures are developed adjacent the low pressure face. The burst regions of the disc preferably include concavo-convex portions, with the convex faces thereof forming a part of the low pressure face and extending into corresponding openings through the adjacent backing member. The assembly finds particular utility in projectiles fired from hand held weapons, in order to sequence and divide the recoil forces developed when the weapon is fired to thus protect the user from injurious recoil forces.

7 Claims, 5 Drawing Figures

Fig. 1

Fig. 6

Fig. 3

Fig. 2

Fig. 4

4,505,180

# HIGH REVERSE PRESSURE RESISTANT LOW FORWARD BURST PRESSURE RUPTURE DISC ASSEMBLY

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention is broadly concerned with a rupture disc assembly having the characteristics of resistance to high burst pressures in one direction, while permitting rupturing under the influence of relatively low burst pressures in the opposite direction. More particularly, it is concerned with such a rupture disc assembly having particular utility in projectiles fired from hand held weapons in order to permit staged ignition of the propellant in the projectile, so that weapon can be used without fear of injuring the user.

### 2. Description of the Prior Art

Rupture disc assemblies have been used in the past in many contexts requiring rapid discharge or venting of materials. To give but one example, certain types of fire or explosion suppression apparatus include a pressurized tank of suppressant material along with a rupturable disc assembly sealing the material tank; when a hazard is sensed through a remote sensing mechanism, the disc assembly is ruptured, typically through the use of explosive charge, in order to permit the pressurized suppressant material to rapidly pass from the tank and into the area to be protected. Such rupture disc assemblies include a circular, concavo-convex metallic frangible rupture disc, which in many instances is scored to facilitate rupture thereof along predetermined lines of weakness. However, it will be perceived that disc assemblies of the foregoing type are designed to withstand the pressure condition exerted by the material within the suppressant tank, and normally the pressure conditions against the remote face of the frangible disc are at atmospheric or essentially unchanging, and in no event do pressure conditions against this remote face alter the burst characteristics of the overall assembly.

In recent years a number of hand held anti-tank field weapons have been developed for use by infantry troops against tanks or other armored vehicles. Generally speaking, these weapons include an elongated firing tube and firing mechanism, along with armor-piercing projectiles to be fired. The projectiles include a forward armor-piercing head, along with a solid propellant which is ignited when the weapon is fired. In order to be effective, such projectiles must achieve relatively high muzzle velocity, and hence the amount and type of propellant used with the projectile is an important consideration. However, in order to achieve desirable muzzle velocities, relatively high recoil forces are likewise necessarily developed. In the case of hand held weapons though, there is a limit to the magnitude of recoil forces which can be absorbed by the user, and this in turn has tended to place a maximum limit upon projectile propellant, and hence muzzle velocity.

## SUMMARY OF THE INVENTION

It has now been discovered that a specialized rupture disc assembly can be provided which resists and withstands rupture under relatively high burst pressure conditions directed against one face of the frangible disc thereof, whereas the disc will rapidly rupture upon experiencing relatively low burst pressure against the opposite face thereof. In the context of hand held weapon projectiles, provision of such a rupture disc assembly in the projectile propellant makes it possible to sequence and divide the ignition of a propellant charge, to thereby divide the recoil forces generated during firing of the weapon. This is turn permits the firing personnel to absorb sequentially generated recoil forces which, if generated simultaneously, would be so great as to potentially injure the user.

Broadly speaking, the rupture disc assembly of the invention comprises a frangible metallic disc presenting a low pressure face, an opposed high pressure face, and scoring on the high pressure face disposed at least partially about a rupture region for the disc. A backing member also forms a part of the assembly and is positioned adjacent the low pressure face. The backing member includes rigid web means in substantial alignment with the disc scoring and in close proximity to the low pressure face for engaging and preventing rupturing of the disc under the influence of relatively high burst pressures directed against the high pressure face. The backing member further includes structure defining an opening through the backing member for exposing an area on the low pressure face corresponding to the rupture region, so that such exposed low pressure face area can experience burst pressures. This permits rupturing of the disc along the scoring when relatively low burst pressures are directed against the low pressure face.

In preferred forms, a plurality of disc rupture regions are provided, each including a concavo-convex portion, with the convex faces of the portions forming a part of the overall low pressure face for the disc. Correspondingly, the backing member includes respective openings receiving the concavo-convex portions, with each portion extending into a corresponding backing member opening.

The disc backing member is preferably circular in configuration, with the scoring on the disc comprising a pair of relatively perpendicular score lines each extending substantially the entire diameter of the disc. The supporting webs forming a part of the backing member are advantageously of a width substantially greater than the width of the corresponding disc scoring, in order to provide ample backing support. Similarly, a peripheral support ring is provided in engagement with the outer periphery of the high pressure face, in order to unitize the overall assembly.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a fragmentary, schematic, vertical sectional view illustrating the firing tube of a hand held weapon, with a projectile situated within the firing tube, the projectile including the rupture disc of the assembly situated between respective portions of the projectile propellant;

FIG. 2 is an enlarged vertical sectional view similar to that of FIG. 1 and illustrating the details of construction of the disc assembly;

FIG. 3 is an exploded side view of the components making up the preferred rupture disc assembly;

FIG. 4 is an exploded perspective view which further depicts the components of the preferred rupture disc assembly; and

FIG. 5 is a sectional view similar to that of FIG. 2, but illustrates the burst assembly in a ruptured condition.

4,505,180

3

## DESCRIPTION OF THE PREFERRED EMBODIMENT

Turning now to the drawing, the firing tube 10 of a hand held weapon is illustrated schematically in FIG. 1. The tube 10 houses an elongated, circular in cross section projectile 12 including a fragmentarily illustrated forward portion 14, as well as a propellant portion 16 including an initial propellant charge 18 and a secondary propellant charge 20. The charges 18, 20, are separated within portion 16 by means of a rupture disc assembly 22. Moreover, the tube 10 and projectile 12 include conventional means 24 for ignition and firing of the charges 18, 20, in sequence. That is to say, during firing of projectile 12 as will be described, initial charge 18 is first ignited and, a short time later, the secondary charge 20 is fired. It will also be understood that the structure depicted in FIG. 1 is entirely schematic in nature, and is intended to merely illustrate the preferred environment of use for the rupture disc assembly 22.

Referring now to FIGS. 2-5, it will be seen that the assembly 22 includes a frangible metallic burst disc 26, a metallic, apertured backing member 28 for the disc 26, and a peripheral support ring 30.

In more detail, the disc 26 is circular in overall configuration, and presents a high pressure face 32 and an opposed low pressure face 34. The high pressure face 32 is provided with scoring advantageously in the form of a pair of relatively perpendicular, rectilinear score lines 36, 38 which each extend substantially the entire diameter of the disc. In addition, the overall disc 26 includes four concavo-convex portions 40-46 which are respectively located in the burst region quadrants defined by the score lines 36, 38 (see FIG. 4). The convex faces of each of the portions 40, 46 form a part of the overall low pressure face 34, whereas the concave faces thereof form a part of overall high pressure face 32. In preferred forms, the disc 26 is formed of nickel, although other metals could be employed in this context.

The backing member 28 includes a threaded sidewall 48 permitting installation of assembly 22 within projectile 12, a pair of intersecting, relatively perpendicular, elongated web sections 50, 52, and a total of four openings 54-60 therethrough.

Support ring 30 is simply a circular metallic ring which is configured to abut the outer periphery of disc 26 in order to sandwich the latter between the ring 30 and backing member 28.

The overall assembly 22 is constructed so that the flat face of backing member 28 engages and supports the low pressure face 34 of disc 26. As will be seen from a consideration of FIGS. 2 and 4, the relatively wide, flattened faces of the web sections 50, 52 correspond with and extend along the length of the score lines 36, 38 on remote high pressure face 32 of disc 26. In addition, each of the concavo-convex portions 40-46 is received within a respective, complementally configured opening 54-60 of backing member 28 so that the respective convex faces of the portions 40-46 extend into the corresponding backing member openings 54-60.

The overall construction of the assembly 20 is completed by provision of support ring 30 which engages the outer periphery of face 32. The ring is fixed in place by means of welding, such serving to integrate the three components of the assembly as depicted in FIGS. 2 and 5.

4

In use, assembly 22 is positioned within projectile 12 between the initial and secondary propellant charges 18, 20. Specifically, the assembly 22 is located so that the high pressure face 32 of disc 26 faces initial charge 18, whereas low pressure face 34 faces secondary charge 20.

In the use of projectile 12 including the disc assembly 22, the initial propellant charge 18 is first ignited via the ignition means 24. This in turn develops relatively high burst pressures within the initial charge zone, and this initiates the propulsion of projectile 12 out of tube 10. However, during this sequence the disc 26 of assembly 22 remains intact and does not burst. This is accomplished (see FIG. 2 wherein the arrows 62 indicate the pressures developed upon ignition of initial charge 18) by virtue of the fact that backing member 26 supports the critical rupture areas on the disc. Specifically, the outer circular periphery of the backing member 28 is in direct engagement with the corresponding peripheral edge of the disc 26, and more important the web sections 50, 52 directly engage the face 34 of disc 26 at those regions corresponding to score lines 36, 38. Inasmuch as the web sections 50, 52 have a significantly greater width than the corresponding score lines 36, 38, it will be seen that adequate support is provided to withstand the relatively high burst pressures (on the order of 7,000 psig) developed upon ignition of initial charge 18.

Within a very short time after initial charge 18 is ignited, a secondary charge 20 is ignited through means 24. This in turn serves to develop a burst pressure within the corresponding charge chamber, with the result that burst pressure (denoted by the arrows 64 in FIGS. 2 and 5) is directed against the convex faces of the portions 40-46 situated within the respective backing member openings 54-60. Such pressure build-up (on the order of 230 psig) serves to quickly burst disc 26 along the score lines 36, 38 as indicated in FIG. 5. This occurs very rapidly, and is not hindered by the presence of any backing or reinforcing structure adjacent high pressure face 32, which will be readily seen. In any event, opening of the disc 26 along the score lines 36, 38 serves to quickly vent products of combustion from secondary charge 20 through openings 54-60, and ultimately out the chamber housing initial charge 18, so that the desired muzzle velocity for projectile 12 can be achieved. At the same time, it will be seen that use of the assembly 22 serves to sequence and divide the recoil forces developed by virtue of sequenced ignition of the overall propellant charge 16, to thereby spread the recoil forces concomitantly developed in a manner to prevent injury to the user.

It will also be seen that the disc assembly of the invention can be used in many other contexts where it is desirable to provide resistance to high burst pressures in one direction, while permitting bursting under the influence of relatively low pressures in the opposite direction.

I claim:

1. A rupture disc assembly, comprising:

a frangible disc presenting a low pressure face, an opposed high pressure face, and scoring on said high pressure face disposed at least partially about a rupture region for the disc; and

a backing member adjacent said low pressure face, including:

web means in substantial alignment with said scoring and in close proximity to said low pressure

4,505,180

face for preventing rupturing of said disc under the influence of relatively high burst pressures directed against said high pressure face; and

structure defining an opening through said backing member for exposing an area on said low pressure face corresponding to said rupture region to burst pressures, and for rupturing of said disc along said scoring under the influence of relatively low burst pressures directed against said low pressure face.

2. The assembly of claim 1, said rupture region including a concavo-convex portion, the convex face of said portion forming a part of said low pressure face.

3. The assembly of claim 1, including a peripheral support ring in engagement with the outer periphery of said high pressure face.

4. The assembly of claim 1, there being a plurality of burst regions on said disc, said backing member having an opening therethrough for each burst region.

5. The assembly of claim 4, each of said burst regions having a concavo-convex face of each portion extending into the corresponding backing member opening.

6. The assembly of claim 1, said disc and backing member being circular, said scoring comprising a pair of relatively perpendicular score lines.

7. The assembly of claim 1, said web members being in engagement with said low pressure face.

* * * * *

Appendix B

# United States Patent [19]
Dernbach et al.

[11] 3,845,879

[45] Nov. 5, 1974

[54] SAFETY FITTING

[75] Inventors: Berthold Dernbach; Ewald Jurisch, both of Erlangen; Helmut Landgraf, Tennenlohe, all of Germany

[73] Assignee: Siemens Aktiengesellschaft, Munich, Germany

[22] Filed: Mar. 26, 1973

[21] Appl. No.: 344,581

[30] Foreign Application Priority Data
Apr. 6, 1972 Germany.................... 2216615

[52] U.S. Cl.......................... 220/89 A, 137/68
[51] Int. Cl.................... F16k 17/16; B65d 47/36
[58] Field of Search...................... 220/89 A; 137/68–71

[56] References Cited
 UNITED STATES PATENTS
2,766,904 10/1956 Philip.................... 220/89 A
2,953,279 9/1960 Coffman.................. 220/89 A
2,954,897 10/1960 Hansen et al............. 220/89 A
3,445,032 5/1969 Raidl. Jr. et al......... 220/89 A

3,698,598 10/1972 Wood et al.............. 220/89 A
3,704,807 12/1972 Lidgard................. 220/89 A

Primary Examiner—John Petrakes
Attorney, Agent, or Firm—Kenyon & Kenyon Reilly Carr & Chapin

[57] ABSTRACT

A safety fitting for a pipe or vessel and contained within a flange coupling, the fitting being of the type which will close off flow as long as the pressure on one side of the fitting exceeds the pressure on the other side and will rupture to permit flow when the pressure on the other side exceeds that on the one side is shown. A rupture disc with radial grooves is placed on the one side which will normally be at higher pressure and is backed by a perforated support member placed on the other side such that under normal conditions the support member supports the rupture disc in the area of the grooves. If pressure on the other side exceeds that on the one side the disc is no longer supported and will rupture allowing flow through the fitting.

10 Claims, 7 Drawing Figures

Fig.1

Fig.3

Fig.4

Fig.2

Fig.5

Fig.6

804

Fig. 2a

3,845,879

1

## SAFETY FITTING

### BACKGROUND OF THE INVENTION

The present invention relates to safety fittings in general and more particularly safety fittings for pipes or vessels which are of the type which will close off flow as long as a higher pressure is maintained on one side of the fitting and rupture to permit flow through the fitting if the pressure on the other side exceeds that on the one side.

In various systems such as cooling systems, it is essential that a fluid flow be maintained even if a rupture in a primary system results in loss of the fluid therein. In systems of this nature, an emergency system to supply fluid under such emergency conditions is normally provided. The emergency system can be coupled to the normal system through a safety fitting of the type which will remain closed as long as the pressure in the normal system exceeds that of the emergency system but will open when the normal system pressure falls below that maintained in the emergency system. down. To avoid such a problem the emergency cooling system, obtaining its coolant from the tank V, and the emergency moderator system, obtaining coolant from sump S, are provided. It is essential that the emergency cooling systems be put into operation as soon as possible after a failure occurs. In addition, trouble occuring in measuring and control lines should not effect the starting of the emergency cooling which is vitally important.

In the system shown, the cooling pressure in the reactor circuit K will normally be about 100 bar. The liquid in tank V will be maintained at a pressure of, for example, 10 bar by a

One type of device which will perform this function comprises basically a rupture disc and support member. The rupture disc is placed on the normal system side and is backed by the support member which is placed on the emergency system side. As long as normal pressure is maintained the disc is kept from rupturing. However, if a small differential pressure exists such that the emergency pressure is higher than the normal pressure, the disc will rupture and permit the fluid from the emergency system to flow into the normal system. Such safety fittings have fail-safe characteristics and operate quickly without having to overcome inertia. That is to say that even in the event of a very rapid pressure increase, they will release the full cross section of the pipe line in a very short time.

One particularly important application of such systems is in nuclear reactors. In such reactors it is normal to provide both a normal cooling system and an emergency cooling system, which will provide coolant should anything happen in the normal system. It is particularly important that, should a failure occur, causing the loss of normal coolant, the emergency coolant be supplied with a minimum delay so that no major damage to the reactor core occurs. Such a system will be used in the detailed description below for sake of example.

A type of rupture disc previously used comprises a preformed sheet of metal with a curvature which is placed in the direction of the higher normal pressure. Such discs normally have a flat rim portion which is clamped into a flange connection. The thickness of the sheet metal and the degree of deformation determine a release pressure for any given diameter. The release

2

pressure is also dependent on the operating temperature at the safety fitting.

The convex side of the curved disc will naturally have a higher resistance to pressure than the concave side which faces the lower pressure of the emergency system. To further increase the resistance of the disc to pressure from the convex side, a support member made up of spherical segments is placed on the other side of the disc. Under normal conditions, the pressure in the normal system pushing against the disc and through the disc upon the segments will have a tendency to push them together to form a spherical support behind the disc and keep it from rupturing. However, if the pressure on the support member or emergency system side of the disc exceeds that on the normal side, the segments no longer tend to form a solid support but instead tend to go apart and permit the pressure to rupture the disc and release the full cross section. A fitting of this type has been found to have a number of serious disadvantages. In the first place, the pressure at which the disc will release or rupture is very imprecise. Further, the parts of the ruptured disc and the support can become separated when it breaks and get into the system of the installation. In addition, the difference between the release pressure and the operating pressure is relatively small and narrowly limited. This makes the manufacture of curved rupture disc quite difficult if the desired release characteristics are to be obtained.

Thus, it can be seen that there is a need for an improved rupture disc type safety fitting which provides the quick release needed and also allows ease of manufacturing and good control over release pressures. In addition, such a ruptured disc should have the characteristic that its segments cannot get into the system where it is being employed.

### SUMMARY OF THE INVENTION

The present invention provides such a safety fitting in which a ruptured disc, which is preferably flat, has radial grooves extending out from its center to a predetermined distance from the edge. By not allowing the grooves to extend fully to the edge a solid annular area of full cross section is maintained which will prevent the ruptured disc portions from breaking off and entering the system. The disc is backed by a support member with the disc on the normal system (which will normally be at a high pressure) side and the support member on the emergency system side. The support disc is perforated with a plurality of holes so that it forms a sievelike member. Solid areas of the support member are kept aligned with the grooved portions of the rupture disc so that normal high pressures operating against the rupture disc cannot break through the grooved sections. The support member and rupture disc will be of a thickness such that they can withstand the operating pressure in the system where the fitting is employed which will be acting upon the rupture disc and so that the pressure will not punch through the disc in the areas over the holes. Systems which will operate at more than 100 bar have been designed.

As long as the operating pressure in the normal system remains higher than that in the emergency system the solid leg portions of the support member will continue to support the disc, particularly along the grooved sections and rupture of the fitting and flow therethrough cannot occur. However, should the pressure on the emergency side become higher than that of the

3

normal side it will act through the holes in the support member on the full area of the rupture disc and cause it to rupture at the grooved portions. The pressure differential at which rupturing is required may be easily controlled by controlling the thickness of the grooves in the rupture disc with respect to its diameter.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic diagram of a typical nuclear reactor cooling system in which the safety fitting of the present invention may be employed.

FIG. 2 is a longitudinal cross section of a first embodiment of the safety fitting of the present invention.

FIG. 2a is a longitudinal cross section of a second embodiment of the safety fitting.

FIG. 3 is a plan view of the rupture disc of the safety fitting of FIG. 2.

FIG. 4 is a cross section of a grooved portion of the disc of FIG. 3.

FIG. 5 is a plan view of the support member of the safety fitting of FIG. 2.

FIG. 6 is a perspective view of the rupture disc of FIGS. 2 and 3 in a ruptured condition.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 1 illustrates a typical cooling system for a water-moderated and water-cooled reactor. The reactor core R is normally supplied with coolant via a primary cooling system K. Water is supplied to the moderator via the system M. Coolant is supplied over the line K to the reactor R where it is converted to steam and used to drive a steam generator D after which it is condensed and cooled and provided back along line K. The cooling system K is coupled through a safety fitting B to a supply tank V which has a pressure maintained within it by a compressed gas bottle M. Also shown is a connection to the moderator system M through a second safety fitting B connecting it to a pump P which can draw water out of the sump S of the reactor.

If a break occurs in the cooling system K, the flow of coolant will be lost and the cooling of the fuel elements in the reactor R will not take place. This will cause the fuel elements to become hotter and hotter due to post decay heat and can eventually melt them even if the reactor is immediately shut compressed gas such as nitrogen from compressed gas tank N. The safety fitting B, will, thus, have a pressure of 100 bar on the side coupled to the normal coolant system and 10 bar on the side coupled to the emergency cooling system. As long as the higher pressure on the normal side is maintained the safety fitting B will remain closed. However, if the pressure in the normal system K drops below 10 bar by amount equal to the release pressure differential designed into the safety fitting B, it will open and coolant will be supplied from the tank V to the reactor R. As will be described below, the safety fitting of the present invention permits the differential pressure to be controlled through the design of the grooves in its rupture disc. Similarly, a failure in the moderator circuit M and a drop of normal pressure therein will permit a safety fitting B associated therewith to rupture and pump P will pump coolant from the sump S to provide emergency cooling.

A cross sectional view of the safety fitting B of FIG. 1 is shown on FIG. 2 and FIG. 2A. As shown, the safety

4

fitting will preferably be built into a flange connection comprising pipe flanges 1 and 2. Sealing rings 6 will be placed between the safety fitting and the flanges 1 and 2, to maintain a tight connection. Held between the flanges 1 and 2 and sealing rings 6 is the support member designated generally as 3 with the rupture disc 4 resting against it. Rupture disc 4 is welded with its rim 5 secured tightly to a welding lip 31 of the support member 3. Alternatively, the disc 4 could be sealed separately within the flange using ordinary sealing washers.

FIG. 2A illustrates an alternate method of mounting. As in the embodiment of FIG. 2 the rim 5 of the rupture disc 4 is welded to the support plate 3. In addition, it has its full annular portion, i.e. the portion where no grooves are cut, clamped against the support member 3 with a diaphram welding ring 11. This will prevent any chance of the weld at 5 from tearing open when the disc is ruptured. To assure a good seal, a diaphram welding ring 34 is welded to the support member 3 and then welded to the diaphram welding ring 11 with a weld 34. Similarly, a welding diaphram ring 21 is welded to the other side of the support member 3 with an additional weld 34. The diaphram welding ring 11 and 21 are also welded respectively to the flanges 1 and 2. In this embodiment the sealing rings 6 are placed within grooves in the welding rings 11 and 21 respectively to provide additional sealing.

A plan view of the rupture disc is shown in FIG. 3 and a cross section through one of its groove sections shown on FIG. 4. Each of the grooves 42 extend from the center to a portion near the rim 5. This leaves an annular area 41 of undiminished cross section. Grooves 42 may be made by any of the known methods of cutting metals. Chemical etching and spark erosion methods have been found to be particularly suitable. However, grinding is also possible. Since the thickness of the wall which remains after the groove is cut is particularly important, this thickness being the control over the pressure at which the disc will rupture, the grooves must be made with the greatest care to maintain uniformity and accuracy. Of the above mentioned methods, chemical etching has been found to be the method which allows greatest control over these factors.

A plan view of the support member 3 is shown on FIG. 5. The rupture disc 4 is shown in dotted lines, positioned behind the support member 3. As shown thereon, and as can be seen from the cross sections of FIG. 2 and 2A, the support member 3 contains a plurality of holes 32 causing it to have a sieve like appearance. The pattern of the holes 32 is such that there are solid areas upon which the grooved portions of the ruptured disc, indicated on FIG. 5 as 42', may rest. It is necessary that the grooves rest along these solid sections so that when the normal high pressure is applied against the face of the disc 4, it will not be able to push through the reduced cross section at the grooves 42, i.e. the full cross section is made such that the maximum pressure will not rupture the disc or punch it through one of holes 34. The reduced cross section if placed over a hole would be ruptured and pushed through at the hole. When the pressure on the support member side of the safety fitting exceeds that on the rupture disc side, the fluid will act against the disc 4 causing it to rupture along the grooves 44 and a fluid flow through the holes 32 will occur.

3,845,879

5

The disc in its ruptured condition is shown on FIG. 6. As shown thereon, the rupturing of the disc along the lines 42 will cause triangular sections to be broken out and away from the center to permit flow of the emergency coolant through the safety fitting. The ruptured parts of the disc will rest against the inside of the pipe fitting 1 and because of the annular section 41 will not be able to break away and get into the cooling system.

In one application of this safety fitting a rupture disc having a diameter of 22 centimeters and a thickness of about 0.5 millimeters was constructed. The grooves were cut to leave approximately 0.15 mm of cross section remaining. With these dimensions the disc was found to rupture at a pressure of approximately 4 bar. The fitting was employed in a system wherein the fluid was water at a pressure of approximately 100 bar and a temperature of approximately 300°C. For such an application, the material which is preferably used is stainless steel. For other applications, other materials may be used as long as they will not be attacked by the fluid within the system at the particular operating pressures and temperatures within that system. For example, in some reactors pressures and temperatures even higher than those mentioned above are used. In these types of reactors, the fluid within the system will normally be a liquid metal or a gas. Even under these conditions, construction of a safety fitting according to the present invention presents no serious problems. Because the safety fittings are located outside the flowing portion of the normal system, they can have supplementary cooling supplied if necessary, to avoid breakdown of the safety fitting materials. Similarly, the sealing means within the flange connection can be adapted to meet the requirements of the system in which the safety fitting is installed using techniques and materials well known in the art.

It should be noted that the use of the safety fitting in a nuclear reactor was only used herein as an example. Such a safety fittings may also find use in other installations such as in chemical processes where stringent safety requirements are maintained. Similarly, the dimensions given in the example above, may be varied depending on the intended application of the safety fitting. In each case, the diameter of the rupture disc, the number and thickness of the grooves as well as the material to be used will be tailored to the particular application. In addition, other forms of lines 42 may be used, i.e. they need not be straight lines but may be curved lines, as long as the support member is designed so as to provide a solid support for all areas having reduced cross section because of the grooves.

Thus, an improved safety fitting of the rupture disc type which is simple to manufacture, provides good control over rupture pressures and will not permit ruptured segments to enter into the system in which it is installed has been shown. Although a specific embodiment has been shown and described, it will be obvious to those skilled in the art that various modifications may be made without departing from the spirit of the invention which is intended to be limited solely by the appended claims.

6

What is claimed is:

1. A safety fitting for use in pipe lines and the like comprising:
 a. a substantially flat rupture disc containing a plurality of radial grooves extending from the center to a predetermined distance from the rim of the disc thereby leaving annular area of undiminished cross section near the rim;
 b. a support member having a plurality of holes therein patterned so as to provide solid areas corresponding to the location of the grooves in said rupture disc; and
 c. means to support said rupture disc and said support member within a pipe line with said rupture disc resting against said support member with its grooves aligned with the solid areas of said support member, and facing the side of said pipe line in which a normally higher pressure is expected, whereby a higher pressure on said normal side of said line will press said rupture disc against said support member and prevent flow through the safety fitting but a higher pressure on the support member side of said safety fitting will cause said disc to rupture along said grooves and permit a flow through said safety fitting.

2. The invention according to claim 1, wherein the full thickness of said rupture disc and the diameter of said holes in said support member are such that normal system pressure will not cause said disc to rupture through said holes.

3. The invention according to claim 2 wherein the depth of the grooves in said rupture discs is of a thickness such as to cause the disc to rupture at a predetermined release pressure.

4. The invention according to claim 3 wherein the rupture disc is tightly welded to said support member at its rim and wherein said support member is sealingly supported within a pipe line flange connection.

5. The invention according to claim 4, wherein said support member is sealed by a pair of sealing rings placed respectively between one side of said support member and a first pipe flange and the other side of said support member and a second pipe flange.

6. The invention according to claim 5 wherein said rupture disc and said support member are sealingly supported within a pipe line flange connection.

7. The invention according to claim 6, wherein said rupture disc is also welded to said support member.

8. The invention according to claim 7 wherein said support member is sealed at least by welding.

9. The invention according to claim 8 and further including a pair of diaphram welding rings with one welded to each side of said support member and wherein said welding rings are welded to respective pipe line flanges.

10. The invention according to claim 9 wherein each of said welding ring contain an annular channel on its side which is welded to said support member and further including a pair of sealing ring placed in said channels between said welding rings and said support member.

* * * * *

65

Appendix C

UPSTREAM FACE

COUNTERBORE TO .187"
WEB THICKNESS

60.0 CHAMFER

1.200" DIA.

.050"

.050"

.15 "

.40"

.75 "

.050"

1.355 - 1.365 DIA.
1.37R DIA.

.17"SUP'T, WEB

.06 SUP'T WEB

.900" I.D.DIA.

.06 TYP

DOWNSTREAM FACE

MATERIAL 304 S.S.
PER MIL/T-8504.
STOCK 1.500 O.D.

**TOLERANCES**

| X | = ± | |
|---|---|---|
| XX | = ± | .030 |
| XXX | = ± | .010 |
| ANGULAR ± | .010 | |

| SCALE FULL | CHECKED | |
|---|---|---|
| DATE 12/7/65 | APPROVED | |

# STARLINE ENGINEERING COMPANY
237 SAN FERNANDO RD.
LOS ANGELES, CALIF.

DRAWN NEWMAN

SUPPORT WEB FOR DIAPHRAGM

65A722

DIAPHRAGM PAT. NO. 3195769.

MATERIAL: 300 SERIES ST. STL. PER MIL-5959A

BURST PRESS. 50±15 PSI

1.0"DIA.

1.350" DIA. ±.005

.016 RAD. (TYP)

.006"

ORIENT COIN GROOVE WITH .13 SUPPORT WEB COIN GROOVE

.25 HINGE

.45(TYP) 1" PLACES

.55(TYP) 4 PLACES

| TOLERANCES | |
|---|---|
| X — ± .030 | |
| XX — ± .010 | |
| XXX — ± .010 | |
| ANGULAR ± .010 | |

| SCALE FULL | | |
|---|---|---|
| DATE 12/7/65 | CHECKED | DRAWN NEWMAN |
| | APPROVED | |

**STARLINE** ENGINEERING COMPANY
237 SAN FERNANDO RD.
LOS ANGELES 31, CALIF.

DIAPHRAGM

810

1. WELD IN SEQUENCE SHOWN
2. BURST PRESS. 50+15 PSI.
3. 800 PSI (MIN.) IN REVERSE DIRECTION
4. MIN. FLOW AREA AFTER BURST .45 SQ. INCHES
5. ELECTRO-CHEM. ETCH LOW BURST PRESS
6. + FLOW DIRECTION PER RA0104-008.
7. CLEAN PER RA0110-015
8. DOUBLE HINGED DIAPHRAGM TYPE WITH PETALS RETAINED.
9. WELD PER RA0107-027 (4 PLACES)

DIAPHRAGM PAT. NO. 3195769

AN818-16C NUTS 2 EA.

AN819-16C SLEEVES 2 EA.

1." DIA. TUBING .065 WALL 2 PCS.

6.0"

WELD #4
WELD #3
WELD #2 DIAPH.
WELD #1

BURST DIRECTION

REVERSE PRESS. SUPT. WEB

| TOLERANCES | | |
|---|---|---|
| X | ± | .030 |
| XX | ± | .010 |
| XXX | ± | .010 |
| ANGULAR ± | | |

| SCALE FULL | CHECKED | |
| DATE 12/7/65 | APPROVED | DRAWN NEWMAN |

STARLINE ENGINEERING COMPANY
237 SAN FERNANDO RD.
LOS ANGELES 31, CALIF.

DIAPHRAGM LINE MOUNTED BURST ASSY.

65A725